IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAREN MARTINELLI     :
      **Plaintiff**  :
          :
  v.        :   3:CV-02-2292
          :   (CHIEF JUDGE VANASKIE)
PENN MILLERS INSURANCE COMPANY :
      Defendant :

### MEMORANDUM

This case concerns alleged gender discrimination in employment at Defendant Penn Millers Insurance Company ("PMIC"). Plaintiff Karen Martinelli claims gender-based salary discrimination, sex discrimination in the decision to fire her, wrongful retaliation for her exercise of statutorily protected rights, and a hostile work environment. Recovery is sought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. § 955.

PMIC has moved for summary judgment on all claims. Because Plaintiff has presented sufficient evidence to cast doubt on PMIC's articulated rationale for paying more salary to comparably-situated males and its decision to fire her, summary judgment on the claims pertaining to compensation and her discharge (which encompasses both the disparate treatment and retaliation claims) will be denied. Because the evidence does not support an inference that the alleged harassment was sufficiently severe or pervasive as to have altered the terms of Plaintiff's employment, summary judgment on the hostile work environment claim will be granted.

## I. BACKGROUND

### A. Factual Background

PMIC is an insurance underwriter that performs a large volume of commercial insurance underwriting in the agricultural field (referred to as "agribusiness") across the United States. It maintains an office in Wilkes-Barre, Pennsylvania. Martinelli was originally hired by PMIC as a personal lines underwriter on October 11, 1993, but she resigned from this position in May of 1994 for personal reasons. On February 13, 1995, Martinelli was rehired by PMIC as an agribusiness underwriter.

Martinelli's direct supervisor in 1995 was Sandy Rukstalis, the Assistant Manager of Agribusiness Underwriting, who reported to Harold Roberts, then Vice-President of Underwriting at PMIC. In August of 1996, PMIC hired Gary Grausam as an agribusiness underwriter at a salary of $34,996, which was $6,916 more than Martinelli's salary at that time of $28,080. PMIC justifies its decision to pay Mr. Grausam nearly 25% more than it paid Ms. Martinelli because of his purportedly greater experience in the underwriting field.

Martinelli and Grausam continued to work together until Grausam retired in March of 2001. At the time of his retirement Mr. Grausam was earning $39,572 and Martinelli was earning $34,424, a difference of $5,148. The differential in compensation had been reduced over the years because Martinelli consistently receive better performance evaluations, and thus larger raises on a percentage basis, than Grausam.

Martinelli first learned that she received less salary than Grausam when he retired.   In April of 2001, Martinelli wrote to the Women's Bureau in the National Resource and Information Center of the U.S. Department of Labor concerning the pay discrepancy.  (Plf's Ex. R.)   In her letter, Martinelli stated:

> I have drafted a letter to my employer, (included on the following page) but I don't know if I have the 'guts' to submit it.  I can't afford to suffer any repercussions.  You see, our company is known for the 'good ole boy' network and I don't know if I should rock the boat . . . .  Can I file or speak to someone anonymously before I decide to take any action.

In reply to this inquiry, a representative of the Women's Bureau, by letter dated April 30, 2001, suggested that Plaintiff tell her "employer that the pay differential has come to your attention and ask what the reasons for the differential are, thus giving your employer a chance to respond."  (Plf's Ex. R.)

In May of 2001, Martinelli expressed her concerns regarding the disparity in pay to her immediate supervisor, Ms. Rukstalis.  (Plf's Dep. at 71-72; Plf's Aff. at ¶ 55.)  On May 17, 2001, Plaintiff wrote to the Equal Employment Opportunity Commission, pointing out the pay differential despite the fact that both she and Grausam had substantial experience in the industry and that she, unlike Grausam, had an Associates Degree in General Business.  (Plf's Ex. S.)  Her letter also complained that a male, Jim McGinn had recently been given Grausam's position at an annual salary substantially equivalent to hers (despite the absence of equivalent experience), and that PMIC paid McGinn a "sign on" bonus of $10,000.  Martinelli noted that

she was to be involved in training McGinn.

PMIC claims that it had difficulty finding a qualified replacement for Grausam.  At the time that PMIC offered the position to McGinn, he was working for PMIC as a marketing representative at a salary of $34,230 and had use of a company car.  The $10,000 bonus was purportedly awarded to compensate for the loss of the company car and to cover expenses of relocating from the State College, Pennsylvania area to Wilkes-Barre.  Plaintiff disputes PMIC's claim that it had difficulty replacing Grausam, pointing to evidence that there were women who had assisted Grausam and who were fully qualified to assume the responsibilities of agribusiness underwriter.  (See, e.g., Grausam, Klim and Bedwick Affidavits.)

In late July or early August of 2001, Martinelli had an unpleasant encounter with Roberts, the Vice President of Underwriting, concerning an incorrect premium quote proposal.  Martinelli followed up the encounter with a memorandum dated August 1, 2001, in which she directed the following comment to Roberts: "If you have any questions, please ask me, 'don't jump down my throat.'" (Def's Ex. 18.)  In response to her memorandum, Tom Donnelly met with Martinelli, Sandy Rukstalis and Harold Roberts on August 2, 2001.  At the meeting, Martinelli explained to Mr. Donnelly that she felt Mr. Roberts treatment of her was disrespectful and that it was unnecessary for him to raise his voice when he addressed her.

The following day, August 3, 2001, Martinelli approached Roberts and admitted that she may have overreacted by writing the memo to Mr. Donnelly and that her actions were

4

inappropriate. (Martinelli Dep. I, Pt. A at 176.)  In a handwritten memorial of the August 3

discussion, Roberts wrote that, in reply to his question as to whether there were any other

issues as to how he had treated her over the years, Martinelli said that she was concerned

about the pay differential that had existed between her and Grausam, as well as the

compensation package that McGinn was receiving.  (Def's Ex. 18.)  Roberts told her that he

could not discuss compensation matters and suggested that Martinelli contact the human

resources department.  (Id.)

On August 4, 2001, an employee of one of PMIC's insureds, Farm Chemical Group of

Monroe, Louisiana ("Farm Chemical"), was involved in an auto accident.  Sherman Shaw, Jr., a

Farm Chemical driver, was driving a company vehicle, allegedly under the influence of alcohol,

and collided with a vehicle driven by Patricia Ann Gayden.  Ms Gayden died as a result of the

injuries sustained in the accident.  Martinelli was the underwriter assigned to the Farm Chemical

account.  (Martinelli Dep. I, Pt. A at 107-08.)

PMIC determined that Martinelli should have discovered that a Motor Vehicle Report

("MVR") received in later April of 2001 had disclosed that Shaw had a prior DUI conviction.

Presumably, discovery of this information may have enabled PMIC to avoid the risk.  Martinelli,

while acknowledging that it was her responsibility to take appropriate action on the basis of a

report that an insured has a DUI offense, contends that it was company policy to have Assistant

Underwriters conduct the initial review of MVRs and bring problematic reports to the attention of

the lead Underwriter.[1]

As a result of its review of the Farm Chemical matter, PMIC decided to conduct an audit of other accounts underwritten by Martinelli from February 2001 until August 2001.  The audit revealed that eight of nine new auto coverage accounts approved by Martinelli did not contain required signed auto selection forms.  (Martinelli Dep. I, Pt. A at 145-46; Def's Ex. 17.)  Other documentation deficiencies were also noted.

As a result of the audit, PMIC issued Martinelli a "Performance Warning" and placed her on probation for ninety (90) days, effective September 6, 2001.  (Def's Ex. 17.)  During this period, Martinelli's work was to be subject to random audits.  A determination as to whether the probationary period should be extended was to be made prior to the end of the 90 days.  (Id.)

By memorandum dated December 7, 2001 and addressed to Assistant Vice President Pat Staples, Martinelli noted that her probationary period had ended.  (Def's Ex. 20.)  In this memorandum, Martinelli referenced a discussion with Staples on October 31, 2001, during which Martinelli indicated that she had been "unfairly accused of not following proper procedures when in fact there were no such procedures in place." (Id.)  By memorandum dated December 21, 2001, Staples informed Martinelli that she had successfully completed her probationary period.  (Def's Ex. 21.)  In response to Martinelli's statement that she had been "unfairly accused" of not following company procedures, Staples wrote that procedures were in

---

[1] Martinelli's contention is substantiated by the affidavits of Grausam, Klim and Bedwick.

place and properly communicated to all staff.  (Id.)

Martinelli remained convinced that she had been unfairly singled out for disciplinary action as a result of her expressed concern over wage disparities.  (Def's Ex. 22.)  On December 29, 2001, Martinelli filed a charge of discrimination with the EEOC.  (Plf's Ex. U.) She asserted both sex discrimination and retaliation in connection with the pay differential matter and the discipline she received after raising the unequal pay claim.  It appears that the administrative complaint was served on PMIC in later January or February of 2002.  (Plf's Ex. V.)

On February 28, 2002, Roberts wrote to Martinelli about the failure to bind umbrella coverage of $4,000,000 for the Federal Drier & Storage account.  (Def's Ex. 23.)  Roberts stated that the broker's representative had told him that she had been waiting for Martinelli to add the umbrella coverage since March of 2001, and had contacted Martinelli in October of 2001 about the matter.  (Id.)  Martinelli attributes the failure to issue the umbrella coverage to poor internal file handling procedures, stating that umbrella coverage could not be issued until a renewal policy had been handled, and Grausam was in charge of renewals.  (Martinelli Aff. at ¶¶ 192-248.)  She claims that she took appropriate steps to have umbrella coverage issued, but the matter apparently slipped as a result of Grausam's retirement and his failure to have the account file forwarded to her.  She also points out that the broker on the account, Bobby Davis, offered to serve as a reference for her after she was fired.  (Plf's Ex. I)  The matter was resolved

by having umbrella coverage in effect as of March 2001, but no premium was charged and the broker did not earn any commission. PMIC does not indicate, however, how much the premium would have been or how much in commission was lost by the broker.

By memorandum dated March 11, 2002, Roberts informed Martinelli of an apparent failure to provide Employee Benefits Liability coverage effective April 1, 2001, as requested by the Almyra Farmers Association. (Ex. 28 to Roberts' Aff.) Martinelli responded by memorandum dated March 12, 2002. She stated that she had replied to a November, 2001 communication on behalf of the insured and had directed the "rater" to correct the error. (Plf's Ex. AAA.) The rater, however, informed the insured that Martinelli had indicated that coverage would be added effective April 1, 2002. (Martinelli Aff. at ¶¶ 268-273.) Martinelli also suggested that the insured may have agreed to wait until the April 2002 renewal to add the coverage. (Plf's Ex. AAA.)

By memorandum dated March 15, 2002, Roberts and Rukstalis informed Plaintiff that her employment with PMIC was terminated, effective immediately. (Ex. 32 to Roberts' Aff.) In their memorandum, Roberts and Rukstalis concluded that the errors on the Federal Drier & Storage and Almyra Farmers Association accounts were attributable to Martinelli. They also determined that the errors exposed PMIC to serious financial risk and deprived it of unspecified premium income. They further found that the performance deficiencies related to issues that had been brought to Plaintiff's attention on September 6, 2001, and had occurred during the

probationary period.

### B. Procedural History

This litigation commenced with the filing of the Complaint by Plaintiff on December 16, 2002.  On April 7, 2004, Defendant filed a motion for summary judgment (Dkt. Entry 15) with a brief in support of the motion (Dkt. Entry 33) filed on May 5, 2004.  On July 12, 2004, Plaintiff filed a brief in opposition to Defendant's motion for summary judgment.  (Dkt. Entry 40.)  Defendant filed a reply brief in support of the motion for summary judgment (Dkt. Entry 52) on September 17, 2004.  Plaintiff's motion for summary judgment has been fully briefed and is now ripe for disposition.

## II. DISCUSSION

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to

the nonmoving party.  Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982).  The moving

party has the burden of showing the absence of a genuine issue of material fact, but the

nonmoving party must present affirmative evidence from which a jury might return a verdict in

the nonmoving party's favor.  Anderson, 477 U.S. at 256-57.  Merely conclusory allegations

taken from the pleadings are insufficient to withstand a motion for summary judgment.  Schoch

v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is to be

entered "after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317,

322 (1986).

### A.  Unequal Pay

PMIC asserts that under Third Circuit law, Title VII unequal pay claims are analyzed

under the familiar burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S.

792, 802-04 (1973).  (Brief in Supp. of Summ. J. Mot. at 9-10.)  PMIC does not dispute that

Martinelli is able to present sufficient evidence to defeat summary judgment as to the existence

of a prima facie claim of unequal pay, i.e., "that employees of the opposite sex were paid

differently for performing equal work – work of substantially equal skill, effort and responsibility,

under similar working conditions." Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000);

see also Miller v. Beneficial Mgmt. Corp., 977 F.2d 834, 846-47 (3d Cir. 1992) (the standard for

a prima facie case under the Equal Pay Act also serves as the standard for a prima facie case in an unequal pay Title VII action).  Martinelli has presented evidence demonstrating that Grausam received a higher salary than she did while both were employed as agribusiness underwriters at PMIC.  Furthermore, Martinelli has also demonstrated that Mr. McGinn's compensation, when you include his salary and signing bonus, was greater than her compensation for the same position even though he had less experience.

Since Martinelli has established a prima facie claim of unequal pay, the burden shifts to PMIC to present a legitimate, non-discriminatory reason for the disparity in pay between Martinelli and Messrs. Grausam and McGinn.  PMIC asserts that Mr. Grausam was paid more than Martinelli because he "had substantially more underwriting and underwriting management experience than Martinelli." (Def. Br. in Supp. Mot. Summ. J. at 15.)  In addition, PMIC asserts that Martinelli actually received $104 more in salary than Mr. McGinn for her position of agribusiness underwriter. (Def. Reply Br. at 3.)  PMIC claims that the one time signing bonus that Mr. McGinn received was to compensate him for the loss of his company car, moving expenses, and to entice him to accept the position of agribusiness underwriter.

These explanations are gender-neutral, and  PMIC has thus satisfied its burden.  The dispositive question here is whether Martinelli has presented evidence sufficient to support an inference that the articulated rationales for the pay discrepancies are a pretext for gender discrimination.  Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 235 (3d Cir. 1999);

11

Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

To defeat a motion for summary judgment, the plaintiff must proffer evidence "from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Showalter, 190 F.3d at 235; Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)(en banc).  "To discredit the employer's proffered reason, [ ] the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . .  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Fuentes, 32 F.3d at 765 (citation omitted).  The trial court's function on a summary judgment motion is to determine whether the plaintiff's evidence is sufficient "to permit a reasonable fact finder to conclude that the [employer's] reasons are incredible . . . ." Sheridan v. E.I. DuPont De Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996).

In this case, Martinelli has introduced evidence that PMIC's claim of difficulty in locating a successor for Grausam is not credible.  She has presented evidence that assistant female agribusiness underwriters were interested in the position and rejected.  This evidence is sufficient to call into doubt the rationale advanced by PMIC for transferring McGinn from another position into the agribusiness underwriting job and effectively paying him more than

Martinelli.  Furthermore, the fact that PMIC was willing to pay McGinn more than Martinelli even though she had much more relevant experience serves to undermine PMIC's contention that Grausam's greater experience was the basis for paying him 25% more than Martinelli. Furthermore, although greater experience may be a gender-neutral basis for disparate compensation, see Best v. Janerich, 80 F. Supp. 2d 334, 337 (M.D. Pa. 1999), it is not necessarily dispositive.  See EEOC v. Altmeyer's Home Stores, Inc., 698 F. Supp. 594, 598 (W.D. Pa. 1988).  The nature and quality of the experience has to be considered.  Id.  Plaintiff has presented sufficient evidence that her experience was at least equivalent to that of Grausam's when he was hired.  She has also presented evidence that she consistently performed at a higher level than Grausam, as evidenced by the fact that her yearly compensation increases were, in relative terms, higher than Grausam's.  This evidence calls into question the relevance of Grausam's prior experience to the ability to perform as an agribusiness underwriter.  Thus, Martinelli has satisfied her burden on the summary judgment motion.

Another pertinent factor in determining that PMIC is not entitled to judgment as a matter of law concerns the absence of pay scales or policies that took into account prior experience. PMIC has failed to point to any company policy on experience in setting starting salary levels.  It has not produced pay tables or any other evidence that it had a gender-neutral methodology for weighing the value of experience in determining compensation.  Under these circumstances,

summary adjudication of the equal pay claim is not warranted.

### B.  Discriminatory and Retaliatory Discharge

Plaintiff claims that she was fired because of her gender and in retaliation for having filed a charge of discrimination with the EEOC.  Title VII, of course, bans employment discrimination "because of such individual's . . . sex"  42 U.S.C. § 2000e-2(a).  Title VII also makes it unlawful to retaliate against a person who has filed an employment discrimination charge.  42 U.S.C. § 2000e-3(a).  Where, as here, there is no direct evidence of a discriminatory or retaliatory motive, disparate treatment and retaliation claims are analyzed under the burden shifting framework articulated in McDonnell Douglas.

Under this approach, a plaintiff terminated from her job establishes a prima facie case of disparate treatment by showing: 1) the plaintiff is a member of a protected class; 2) the plaintiff was qualified for her position; and 3) the plaintiff was terminated under circumstances giving rise to an inference of discrimination. See Waldron v. SL Industries, Inc., 56 F.3d 491, 494 (3d Cir. 1995); Veillard v. Spring House Leasing, Inc., Civ. A. No. 93-2144, 1994 WL 376912, at *2 (E.D. Pa. July 18, 1994); Dodge v. Susquehanna Univ., 785 F. Supp. 502, 506 (M.D. Pa. 1992). To advance a prima facie case of retaliation under Title VII, a plaintiff must show that: "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse

14

action." <u>Abramson v. William Paterson College of N.J.</u>, 260 F.3d 265, 286 (3d Cir. 2001);

<u>accord</u> <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1299 (3d Cir. 1997).  With respect to the

third prong, causation may be inferred from the temporal proximity between the protected

activity and the adverse action, intervening antagonism, or retaliatory animus.  <u>See</u> <u>Farrell v.</u>

<u>Planters Lifesavers Co.</u>, 206 F.3d 271, 280-81 (3d Cir. 2000).

If the plaintiff establishes a prima facie case on either claim, the burden of production

shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the discharge.

<u>See</u> <u>Showalter</u>, 190 F.3d at 235.  If the defendant satisfies this requirement, then the burden of

production returns to the plaintiff, who must present evidence that the reasons offered by the

defendant were a pretext for discrimination or retaliation.  <u>Shaner v. Synthes</u>, 204 F.3d 494, 500-

01 (3d Cir. 2000).

In this case, PMIC asserts that Martinelli cannot establish a prima facie case of disparate

treatment because she cannot show that her termination occurred under circumstances giving

rise to an inference of discrimination.  (Def's Br. in Supp. of Mot. Summ. J., at 21.)  As to the

retaliation claim, PMIC argues that Plaintiff is unable to present any evidence suggesting a

causal relationship between the exercise of statutorily protected rights and an adverse

employment action.  (<u>Id</u>. at 43.)  The gist of PMIC's position on both claims is Plaintiff's

purported inability to show that she was treated any differently than any other employee whose

performance was seriously deficient.  Plaintiff, while acknowledging that there were problems

with certain accounts that were assigned to her, counters by presenting evidence that the problems were not her fault.  She has also presented evidence that the alleged deficient performance did not warrant the sanction of dismissal.  Finally, she points to the fact that her termination occurred shortly after service of the employment discrimination charge.

PMIC informed Martinelli that she was terminated because of her failure to adequately perform the tasks assigned to her as an agribusiness underwriter.  Specifically, PMIC claims to have terminated Martinelli due to alleged deficient performance on the Federal Drier & Storage and Almyra Farmers Association accounts, as well as her alleged failure to discover the DUI on the Farm Chemical account.  PMIC asserts that Martinelli's mistakes were continuous and increasingly serious as the company was being exposed to greater limits of liability without the ability to collect premiums.

As to the Farm Chemical matter, Plaintiff has presented evidence that the responsibility for conducting initial reviews of MVRs rested with assistant underwriters.  PMIC points out that the assistant underwriter on the Farm Chemical account resigned before receipt of the MVRs in question, suggesting that the initial review responsibility then shifted to Martinelli.  PMIC, however, has not pointed to any evidence indicating that Plaintiff was told that she had to do the work of an assistant underwriter.  Plaintiff has presented evidence that staff was overburdened. It may be that someone should have discovered the DUI, but PMIC has not shown that Plaintiff failed to act in accordance with company procedure.  On the contrary, the record supports an

16

inference that company procedures were compromised by staffing shortages, and not by any

shortcomings in Plaintiff's performance.  It is also significant that the blame was assigned to

Plaintiff shortly after she raised a claim of pay discrimination.

As to the Federal Drier & Storage issue, Plaintiff has presented evidence that umbrella

coverage could not be issued until after the underlying policy was renewed.  She has also

presented evidence that Grausam was responsible for renewals.  Grausam retired at the time

this issue first arose, and the file was never forwarded to Plaintiff for action.  Again, the record

would support an inference that the failure to issue umbrella coverage was attributable to

company-wide problems, and was not the fault of Plaintiff.  It is also significant that there is no

evidence that umbrella coverage should not have issued.  Finally, PMIC has not quantified the

loss in premium that it sustained, a factor plainly relevant to the question of whether the ultimate

sanction of discharge was warranted.

Finally, Martinelli asserts that the responsibility for binding the employee liability benefits

coverage under the Almyra account resided with PMIC's rater, Linda Perzia.  Plaintiff claims

that after receipt of an email in November of 2001 pertaining to the failure to issue employee

benefits liability coverage for Almyra, Martinelli gave Ms. Perzia written instructions on how to

correct the Almyra file.  PMIC disputes this assertion.  If Plaintiff's version is credited, which it

must be on the summary judgment record, then a fact-finder could infer that the company

wrongly attributed fault to Plaintiff.  Once again, there is no contention that coverage should not

have been issued, and PMIC has not presented any evidence to quantify the loss, if any, in premium payments that it sustained.

Plaintiff has also presented evidence that shortcomings of Grausam and McGinn were not treated as seriously by PMIC.  She has also pointed out that male employee, Barry Corrigan, was placed on indefinite probation as opposed to being fired.  There is no evidence that Grausam was ever disciplined or put on probation for his failure to timely issue endorsements.  Grausam acknowledged that it was not uncommon for signed auto selection forms to be missing from underwriters' files and no disciplinary action was taken for that reason. Furthermore, the timing of the discharge, coming shortly after the filing of the discrimination charge, is problematic.

Plaintiff's evidence is adequate to call into question the rationale articulated by Defendant for firing Plaintiff.  If a jury credits Plaintiff's evidence and finds that the reasons articulated by PMIC for firing Plaintiff were not the true motivating factors, then it could infer a discriminatory and/or retaliatory intent.   Accordingly, summary judgment on the disparate treatment and retaliation claims will be denied.

### C.  Hostile Work Environment

As explained by our Court of Appeals:

> To prove an "abusive work environment" under Title VII, the environment must be shown to be objectively hostile or abusive, and the plaintiff must have perceived it as a hostile or abusive environment. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22

> (1993). [Plaintiff] would not need to prove that she suffered injury or that her psychological well-being was seriously affected. *See id.* She would, however, be called upon to show that the harassment was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.' *Id.* at 21 (citing *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67). To judge whether such an environment is hostile or abusive, [the court] must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' *Id.* at 23.

Walton v. Mental Health Ass'n. of Southeastern Pa., 168 F.3d 661, 667 (3d Cir. 1999).

Because harassment takes on many forms, the comments and behavior need not be overtly sexual in nature.  As the Third Circuit has stated, "the advent of more sophisticated and subtle forms of discrimination requires that [courts] analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." Cardenas v. Massey, 269 F.3d 251, 261-62 (3d Cir. 2001).  At the summary judgment stage, Martinelli must present evidence that PMIC created an environment that a reasonable person would find hostile or abusive. Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 600 (M.D. Pa. 2002).

Plaintiff complains that her work performance was subject to intense scrutiny after she raised the pay disparity issue with Roberts in early August of 2001.  Scrutiny of work performance, however, is an ordinary incident of the employment relationship.  She does not claim that any person acted in a threatening, belittling or demeaning manner towards her.  Her

probationary period expired based upon the employer's perception that her performance was satisfactory.  She has not presented any evidence that the increased scrutiny interfered with her work performance.  On the contrary, she testified that, following the August encounter with Roberts, she performed at her top level.  There is no evidence of unusual absences from work. In her brief in opposition to the summary judgment motion, Plaintiff cites to the affidavits of Grausam, Klim and Bedwick as providing evidence of a hostile work environment.  (Plf's Brief in Opp. to Summ. J. Mot. at 22.)  Significantly, each affiant had terminated his or her employment with PMIC before August of 2001.  Thus, the affidavits do not contain any information pertinent to the hostile environment claim.

Viewing the totality of the circumstance, no rational juror could find that PMIC's actions were objectively offensive so as to create a sexually abusive environment.  Accordingly, PMIC will be granted summary judgment on the hostile work environment claim.

## III.  CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment will be granted as to the hostile work environment claim, and denied in all other respects.  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

Dated: August 29, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAREN MARTINELLI                               :
                              Plaintiff        :
                                               :
        v.                                     :           3:CV-02-2292
                                               :           (CHIEF JUDGE VANASKIE)
PENN MILLERS INSURANCE COMPANY                 :
                              Defendant        :

## ORDER

NOW, THIS 29th DAY OF AUGUST, 2005, for the reasons set forth in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant's "Motion for Summary Judgment" (Dkt. Entry 15) is GRANTED IN PART AND DENIED IN PART.

2. Defendant's motion for summary judgment is GRANTED as to Plaintiff's hostile work environment claim.

3. Defendant's motion for summary judgment is DENIED as to all other claims.

4. A telephonic scheduling conference shall be conducted on Friday, September 16, 2005 at 3:00 p.m.  Counsel for Plaintiff is responsible for placing the call to (570) 207-5720 and all parties should be ready to proceed before the undersigned is contacted.


                                        s/ Thomas I. Vanaskie
                                        Thomas I. Vanaskie, Chief Judge
                                        Middle District of Pennsylvania